**In re Mervin Richard MEWES and Doris Louise Mewes, d/b/a Ranchers, Debtors.**

**Mervin Richard MEWES and Doris Louise Mewes, Plaintiffs,**

v.

**BANKWEST OF SOUTH DAKOTA, Defendant.**

**Bankruptcy No. 385–00043.
Adv. No. 385–0022.**

United States Bankruptcy Court,
D. South Dakota.

Dec. 18, 1985.

See also, Bkrtcy., 58 B.R. 124.

John Harmelink, Harmelink Law Offices, Yankton, S.D., for plaintiffs.

Brent A. Wilbur, May, Adam, Gerdes & Thompson, Pierre, S.D., for defendant.

## MEMORANDUM DECISION

PEDER K. ECKER, Bankruptcy Judge.

### THE SAGA OF "STRETCH," THE "STUD" FULL–BLOOD LIMOUSIN BULL

This matter is before the Court on a counterclaim for turnover of secured proceeds filed on behalf of BankWest by Attorney Brent A. Wilbur, Pierre, South Dakota, on June 17, 1985. BankWest substantively alleges a perfected security interest in the insurance proceeds received by Mervin and Doris Mewes ("debtors") from the unfortunate demise of "MM Stretch," one of the debtors' "stud" Li-

mousin bulls. Attorney John Harmelink, Yankton, South Dakota, represented the debtors. A hearing was held on September 10, 1985, in Pierre, South Dakota.

This sad tale begins on a cold December 4, 1984, evening, two days prior to the end of the deer hunting season. "Stretch," the famous stud full-blood Limousin bull, was shot, not once but twice, by what is presumed to be an overzealous and anxiety-ridden deer hunter. May Stretch rest in peace and his virility not be forgotten.

Fortunately, every cloud has a silver lining. Naming themselves as beneficiaries, the debtors, in July, 1984, secured approximately $100,000 in what is essentially bull term life insurance on Stretch. On February 6, 1985, Trade Insurance paid on this policy, naming both the debtors and BankWest as payees on the check. What this case is about is who receives the insurance proceeds.

The fundamental issues raised are: 1) Did BankWest have a security interest in Stretch, the "stud" full-blood Limousin bull, on the date of his unfortunate demise? 2) If BankWest had a security interest in Stretch, does this interest extend to the insurance proceeds?

The debtors have been operating a ranch in Highmore, South Dakota, since the late 1960's. In the Spring of 1970, they began using Limousin bulls as breeders and, subsequently, it became a large part of their business. While the extent of his virility was unknown at that time, Stretch was purchased by the debtors in the Spring of 1978. Due to difficult economic times, the debtors voluntarily filed for Chapter 11 relief on April 10, 1985.

On May 10, 1984, BankWest and the debtors entered into a security agreement, securing a debt of $646,500.[1] BankWest's security agreement form included approximately a two-inch space between the secur-

---

1. The parties' briefs represented that this was one of two extension security agreements entered into between the parties on May 10, 1984. The other security agreement described certain real property located in Hyde County, South Dakota, as collateral. Apparently, BankWest and the debtors originally entered into a security agreement on July 8, 1982, which secured a $600,000 loan; thereafter, on December 12, 1982, they entered into an extension agreement, extending the note to July 15, 1983.

ity interest granting clause and its all-inclusive security interest grant in "farm products." In this space, the following list was typed in:

Five Hundred and Nine (509) head of cattle branded & described as:

Three Hundred Forty-Five (345) Cows
Ninety (90) Calves—Heifers 1 year old
Fifty (50) Calves—Bulls
Eleven (11) FB Bulls
Eight (8) Steers 1 year old
Five (5) FB Cows
½ interest in Texas Ranger Red Bull
ALSO: Citadel (Bull)
ALSO: Ten (10) Horses (4 Reg. Mares, 6 Geldings)
ALSO: All inventory of Semen—Various Bulls

Immediately subsequent to this space is the following form clause:

ALSO: All machinery, equipment, feed, grain, and crops of every description.

This Security Agreement is intended to *include all farm products, including but not limited to livestock* and the natural increase thereof; crops, feed, and grain; all machinery and equipment, including consumer goods; and all contract rights now owned or hereafter acquired and the proceeds thereof. (emphasis added)

Debtors contend that because Stretch was not listed in the typed portion, as was Citadel and Texas Ranger Red Bull, BankWest had no security interest in Stretch on the date of his demise. Essentially, their argument is that had they intended Stretch as security, his name would have certainly been included because he is more famous than either of the named bulls; therefore, this clearly evidences no intent of providing BankWest a security interest in Stretch. In support of this view, Mr. Mewes testified that Stretch had been listed on previous security agreements, but not this one.[2] While he was unable to recall whether he ever informed BankWest, Mr. Mewes represented that Stretch was not intended as BankWest's security.

Mr. Lynass, who is a BankWest officer and has handled the debtors' account since 1980, testified on behalf of the bank. Well aware of Stretch's abilities, he represented that, based on his own knowledge and notes in the debtors' bank file, BankWest was never informed that Stretch was not part of its security. Mr. Lynass also stated that Stretch's name was not specifically listed because he was considered "livestock" under the security agreement.

■ The first issue is whether BankWest had a security interest in Stretch, the "stud" full-blood Limousin bull, on the date of his unfortunate demise. The Court holds in the affirmative.

Under South Dakota law, BankWest's security interest is unenforceable against the debtors unless it contains a description of the collateral.[3] *See* S.D.C.L. § 57A–9–203. S.D.C.L. § 57A–9–110 directs that:

"[A]ny description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described."

Consistent with this statute, the Court has applied an objective test in determining adequacy of collateral description.[4] *See In re Frasch*, 53 B.R. 89 (Bkrtcy.D.S.D.1985)

---

2. Other than the two May 10, 1984, extension security agreements, no other security agreements were offered into evidence. Stretch the bull was listed on the debtors' 1982 and 1984 financial statements filed with BankWest. *See also* n. 1 and accompanying text.

3. When the collateral is not in the secured party's possession, S.D.C.L. § 57A–9–203 also requires that the debtor has signed the security agreement, has been given value, and has rights in the collateral. These other requirements, however, are not at issue.

4. U.C.C. § 9–110 Official Comments reads, in pertinent part, as follows:

The requirement of description of collateral is evidentiary. The test of sufficiency of a description laid down by this section is that the description do the job assigned to it—that it make possible the identification of the thing described. Under this rule courts should refuse to follow holdings, often found in the older chattel mortgage cases, that descriptions are insufficient unless they are of the most exact and detailed nature, the so-called "serial number" test. . . .

(security agreement terms, "livestock, natural increase, purchase, exchange, and issue," cannot be construed as reasonably describing milk diversion program payments); *In re Thornberg*, 31 B.R. 38 (Bkrtcy.D.S.D.1983) (real estate description in the security agreement cannot be construed as reasonably including a mobile home); *In re Stump*, 8 B.R. 516 (Bkrtcy.D.S.D.1981) (to claim a security interest in household goods, a secured party need not specifically list the goods in the security agreement because the generic term, household goods, reasonably describes the collateral).

Somehow, the debtors must interpret U.C.C. § 9–110 as meaning what is "reasonable" between the particular parties.[5] Again, essentially their argument is that had they intended Stretch as security, his name would have certainly been included because he is more famous than either of the two named bulls; therefore, this clearly evidences no intent of providing BankWest a security interest in Stretch. This argument completely ignores the fact that BankWest is not required to specifically list any secured collateral when it is properly within the scope of a generic term. *See Id.* In other words, neither case law nor statutes require that Stretch the bull be specifically named in the security agreement if he is "livestock." *Id.*

The dispositive issue becomes may the term "livestock" be reasonably construed as including "bulls." The Court holds in the affirmative. Even Mr. Mewes admitted on cross-examination that the term "livestock" includes bulls. *See also United States v. South East Miss. Livestock Farmers Ass'n*, 619 F.2d 435 (5th Cir.1980)

("all livestock" reasonably identifies swine).

Because the Court finds that the term "livestock" reasonably identifies animals which are bulls and because Stretch, while probably a "bull's bull," is still a bull, the Court holds that BankWest had a security interest in Stretch on the date of his demise.

The second issue is if BankWest had a security interest in Stretch, does that interest extend to the approximately $100,000 in insurance proceeds? The Court holds in the affirmative.

S.D.C.L. § 57A–9–306(1) defines the term "proceeds" as including insurance payable by reason of loss or damage. In order for insurance proceeds to be included as part of secured collateral, it is not necessary that a policy of insurance be referred to in the security agreement.[6] *See In re Star Safety, Inc.*, 39 B.R. 755, 756 (Bkrtcy.D.N.D.1984).[7] BankWest's security agreement is sufficient if it merely refers to the "proceeds" of the collateral. *Id.* In the instant case, paragraph one of BankWest's security agreement provides a security interest in "all farm products, including but not limited to livestock ... and the proceeds thereof," and, therefore, is sufficient to include insurance payable by reason of loss or damage to the referenced collateral. *Id.*

Next, it must be determined whether, under South Dakota law, BankWest has both a pre-petition and post-petition perfected security interest in the insurance proceeds. *See* S.D.C.L. § 57A–9–306(3), (4). S.D.C.L. § 57A–9–306(3) provides that certain requirements must be met for the continued perfection of a security interest in insurance proceeds when received by a

5. Absent fraud, mistake, or accident, courts uniformly hold that parol evidence is inadmissible to vary, add to, or contradict the terms of a security agreement which is unambiguous on its face. *See In re Swearingen*, 27 B.R. 379 (Bkrtcy.D.Kan.1983). No allegations of fraud, mistake, or accident were made part of this record. The Court finds that there are no term ambiguities on the face of the instrument because the debtor admitted that a bull is considered livestock.

It should be also noted that the typed portion lists "(11) FB Bulls" and only two were listed by name. Does this mean the other nine were unimportant to the debtors?

6. Paragraph 13 in BankWest's security agreement requires that the debtors insure all collateral from loss or destruction.

7. *See also TerraWestern Grp. v. Berry & Co.*, 207 Neb. 28, 295 N.W.2d 693 (1980).

debtor prior to his filing for relief.[8] In pertinent part, S.D.C.L. § 57A–9–306(3) reads as follows:

> The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected twenty days after receipt of the proceeds by the debtor unless
>
> . . . .
>
> (b) A filed-financing statement covers the original collateral and the proceeds are identifiable cash proceeds. . . .

In the instant facts, it is undisputed that BankWest's financing statement was properly filed, and, therefore, the only remaining question is whether the insurance proceeds are identifiable cash proceeds. Under S.D.C.L. § 57A–9–306(1), checks are clearly cash proceeds, and the insurance proceeds are identifiable because the insurance check was never deposited. Under South Dakota law, BankWest, therefore, had a properly perfected security interest in the insurance proceeds up to the time of the debtors' Chapter 11 filing.

S.D.C.L. § 57A–9–306(4) provides that certain requirements must be met for the continued perfection of a security interest in insurance proceeds after the time of the debtor's filing for relief. *See, e.g., In re SMS, Inc.*, 15 B.R. 496, 500 (Bkrtcy.D.Kan. 1981) (action brought by Chapter 7 trustee on credit memo). In pertinent part, S.D. C.L. § 57A–9–306(4) reads as follows:

> In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest
>
> . . . .
>
> (c) In identifiable cash proceeds in the form of checks and the like which are not deposited in a deposit account prior to the insolvency proceedings. . . .

As determined before, the insurance check is identifiable cash proceeds, and the

check was never deposited in a deposit account prior to the debtors' April 10, 1985, Chapter 11 filing. Under South Dakota law, BankWest, therefore, still had a perfected security interest in the insurance proceeds after the time of the debtors' Chapter 11 filing. *See Id.*

Because the Court finds that the insurance check is "proceeds" covered by the security agreement and that BankWest had a continuously perfected security interest in these proceeds, the Court holds that BankWest has a perfected security interest in the insurance proceeds. As did the life of Stretch, the famous "stud" full-blood Limousin bull, this opinion unfortunately comes to an end.

Accordingly, this Memorandum Decision constitutes the Court's Findings of Fact and Conclusions of Law in the above-entitled matter pursuant to Bankr.R.P. 7052 and F.R.Civ.P. 52. Counsel for the defendant bank is directed to submit a proposed Order and Judgment, consistent with the Court's Findings of Fact and Conclusions of Law, in accordance with Bankr.R.P. 9021, to the Clerk of this Court.

---

**8.** Debtors received the insurance check on February 6, 1985, and filed for Chapter 11 relief on

April 10, 1985.